UNITED STATES for Use and Benefit of
CRANE SERVICE & EQUIP-
MENT CORP.

v.

BOSTON STEEL ERECTION, INC., et al.

UNITED STATES for Use and Benefit of
BOSTON STEEL ERECTION, INC.

v.

EDWARD R. MARDEN CORP. et al.

UNITED STATES for Use and Benefit of
SOUTHERN MASS. CONSTRUC-
TION, INC.

v.

EDWARD R. MARDEN CORP. et al.

UNITED STATES for Use and Benefit of
James M. SALAH and Samuel Pecci,
d/b/a Salah & Pecci Contracting Co.

v.

EDWARD R. MARDEN CORP. et al.

Civ. A. Nos. 68–752–C, 68–754–C
to 68–756–C.

United States District Court,
D. Massachusetts.

Dec. 6, 1973.

**700**

Stanley S. Ganz, Charles H. Riley, Jr., Ganz & Ham, Boston, Mass., for Edward R. Marden Corp., Planet Ins. Co. and American Re-Insurance Co.

Loyd M. Starrett, Michael B. Keating, Foley, Hoag & Eliot, Boston, Mass., for Southern Mass. Construction, Inc. and Boston Steel Erection, Inc.

## OPINION

CAFFREY, Chief Judge.

The above-captioned cases, all arising out of the same fact situation, were consolidated for non-jury trial. All four cases were brought in this court on the basis of the so-called Miller Act, 40 U.S. C.A. §§ 270a–270d. Jurisdiction is premised on 40 U.S.C.A. § 270b. The parties plaintiff in the various cases are Crane Service & Equipment Corp., a Massachusetts corporation (hereinafter Crane); Boston Steel Erection, Inc., a Massachusetts corporation (hereinafter Boston Erection); Southern Mass. Construction, Inc., a Massachusetts corporation (hereinafter Southern); and James M. Salah and Samuel Pecci, d/b/a Salah & Pecci Contracting Co. (hereinafter Salah-Pecci).

In Civil Act 68–752, in which the plaintiff is Crane, the parties defendant are Boston Erection, Southern, Edward R. Marden Corp. (hereinafter Marden), Planet Insurance Company (hereinafter Planet), and American Reinsurance Company (hereinafter American).

In Civil Action 68–752, Crane's Miller Act case against Boston Erection, Marden, Planet and American, a stipulation signed by counsel for Crane, Boston Erection, Southern, Marden, Planet and American has been filed. In pertinent part the stipulation recites:

"The use plaintiff Crane . . . did furnish labor and materials to . . Marden . . . in the form of labor and (3) Manitowoc Truck Cranes. . . . These truck cranes and their operators . . . were used in the prosecution of the work . . . for the construction of a . . . aircraft maintenance hangar at the Naval Air Station in South Weymouth, Massachusetts. . . . There remain unpaid and owing to Crane Service & Equipment the sum of $8,392.61 for labor and material furnished by agreement with Boston Steel Erection, Inc. as aforesaid and the sum of $1,614.48 for labor and materials furnished by agreement with Southern Mass. . . ."

At the opening of the trial of these consolidated cases, the following colloquy appears on page 5 of the transcript:

"The Court: For the case we are not trying, the Crane Service.

Mr. Keating: That one we are not—

The Court: Let us clarify it for the record, between you and Mr. Ganz, what the status of the Crane Service is. You made a stipulation, but no judgment has been entered in that case.

Mr. Ganz: No, your Honor, it would seem to me, to be helpful if we could regard ourselves as trying the Boston Steel Erection case. Crane Service had been disposed of by stipulation.

Even though no judgment as yet has been entered, I don't see any problem so far as Crane Service is concerned."

Accordingly, on the basis of both the stipulation on file and the quoted representation of counsel, I find and rule that Marden and its sureties are liable to Crane in the amount of $8,392.61 on account of labor and materials furnished by Crane pursuant to its agreement with Boston Erection and that Marden and its sureties are also liable to Crane in the amount of $1,614.48 for labor and materials furnished by Crane by reason of its agreement with Southern Mass.

Judgment in favor of Crane will enter for the total of these two sums, namely, $10,007.09, which is the amount this Court finds is due and owing to Crane, plus interest and costs, as against Marden and its sureties. Civil Action 68–752 will not be discussed further in this opinion.

In Civil Action 68–754, in which the plaintiff is Boston Erection, the defendants are Marden, Planet and American. In Civil Action 68–755, in which the plaintiff is Southern, the defendants are Marden, Planet and American. In Civil Action 68–756, in which the plaintiffs are Salah-Pecci, the defendants are Marden, Planet and American. In the various cases the plaintiffs allege that they are subcontractors who have brought suit against Marden, the general contractor, for breach of contract, and against the insurance companies as sureties of Marden pursuant to the provisions of the Miller Act.

On the basis of pendent jurisdiction a claim in tort for negligence has been brought only as against Marden in Civil Actions 68–754, 68–755 and 68–756, by way of an amendment to the complaints in those three cases.

After trial I find and rule as follows: On June 14, 1965 the United States entered into a written contract with the engineering firm of Desmond & Lord, Inc. for studies, preliminary sketches, estimates, drawings and specifications for the removal of a lighter-than-air hangar and the construction of a new aircraft maintenance hangar and certain other structures at the Naval Air Station, South Weymouth, Massachusetts. The contract also provided for Desmond & Lord to furnish engineering consultation during the course of the construction. Desmond & Lord entered into a subcontract with Albert Goldberg & Associates, Inc. to perform the structural engineering services for the hangar installation.

On June 15, 1966 the United States, acting through duly authorized representatives of the Department of the Navy, entered into a written contract with Marden under the terms of which Marden was to serve as general contractor for the erection of the new hangar. The plans and specifications which were incorporated by reference into the general contract between the United States and Marden contemplated that the construction of the new hangar would include the erection of precast concrete arches which were to be formed by uniting two half arches. Each completed arch would weigh approximately 110 tons and would consist of two half arches each of which would weigh approximately 55 tons.

On December 29, 1966 Marden submitted a written proposal regarding the method of arch erection to Desmond & Lord, Inc., which in pertinent part provided as follows:

"Re: Aircraft Maintenance Hangar, South Weymouth, Mass.—NBy 66498 Proposed Method of Arch Erection

We submit herewith our proposed method for the Arch erection at subject project. We have elected to construct the arches on the site and lift them into place as per the second option given in Paragraph 3B.3.3 of the specifications.

1. Inserts will be cast into the arch to receive the lifting fittings all as detailed on the enclosed drawings by Simpson, Gumpertz & Heger, Inc.

2. The arches will be raised from the flat by use of the lifting fittings "A" and rotated to the vertical po-

sition by use of the lifting fittings "B".

3. Each half arch will be placed over the anchor bolts cast into the top of the buttress (Albert Goldberg & Associates, Inc. drawing Sk-l and the top hinge connection will be made in accordance with Albert Goldberg & Associates, Inc. dwg. dated 12/3/66).

4. Rigid Steel bracing w/cables will be attached to one side (the west side) of the arch.

5. As each full arch is erected, it will be secured to the previously erected arch by three precast concrete roof planks, at six (6) locations, welded in place, all as shown on Durastone-Flexicore Approved dwg. No. 1 dated 12/29/66)."

(Plaintiffs' Ex. 26)

After correspondence between Desmond & Lord, Albert Goldberg & Associates, Lt. Jump, the resident officer in charge of construction for the Navy, and Marden during the first three months of 1967, this exchange culminated in a letter written to Marden on April 14, 1967 by Albert Goldberg & Associates, acting as consultants to Desmond & Lord, which stated:

"Gentlemen:

In reply to your letter of April 12, 1967 we are pleased to send you our unqualified approval of your method of arch erection. We have examined the design calculation of Simpson, Gumpertz & Heger; and, in our opinion, they have done an excellent job. However, I am sure you are aware that the actual erection is your responsibility." (Plaintiffs' Ex. 26)

On July 25, 1967 Marden entered into a written contract with Southern under the terms of which Southern, acting as a subcontractor, was to furnish all material and perform all structural steel work and all open web steel erection on the hangar site. (Plaintiffs' Ex. 3)

On July 28, 1967 Marden entered into a written contract with Boston Erection under the terms of which Boston Erection, acting as subcontractor, was to erect the arches, the roof planking and temporary lateral bracing of the hangar while under construction. (Plaintiffs' Ex. 2)

The general contract between the United States and Marden (Plaintiffs' Ex. 25) followed the general outlines of standard government construction contracts. The following provisions in the general contract between the United States and Marden should be noted to the extent they bear on the undertaking and obligations assumed by the respective parties to this general contract.

Article 9, entitled Material and Workmanship, provides in pertinent part as follows:

"All work under this contract shall be performed in a skillful and workmanlike manner. The Contracting Officer, may, in writing, require the Contractor to remove from the work any employee the Contracting Officer deems incompetent, careless, or otherwise objectionable."

Article 10, entitled Inspection and Acceptance, provides in pertinent part:

"Except as otherwise provided in this contract, inspection and test by the Government of material and workmanship required by this contract shall be made at reasonable times and at the site of the work, unless the contracting officer determines that such inspection or test of material which is to be incorporated in the work shall be made at the place of production . . ."

"The Contractor shall, without charge, replace any material or correct any workmanship found by the Government not to conform to the contract requirements . . ."

"If the Contractor does not promptly replace rejected material or correct rejected workmanship, the Government (1) may, by contract or otherwise, replace such material or correct such workmanship and charge the cost thereof to the Contractor, or (2) may

terminate the Contractor's right to proceed . . ."

"The Contractor shall furnish promptly, without additional charge, all facilities, labor, and material reasonably needed for performing such safe and convenient inspection and test as may be required by the Contracting Officer. All inspection and test by the Government shall be performed in such manner as not unnecessarily to delay the work."

Article 12, entitled Permits and Responsibilities, provides:

"The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with applicable Federal State, and municipal laws, codes and regulations, in connection with the prosecution of the work. He shall be similarly responsible for all damages to persons or property that occurs as a result of his fault or negligence. He shall take proper safety and health precautions to protect the work, the workers, the public and the property of others. He shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire construction work, except for any completed unit of construction thereof which theretofore may have been accepted."

The section of the general contract which deals with the presence on the job site of a representative of the United States is Article 24, entitled Government Representatives, and provides:

"The work will be under the general direction of the contracting officer, the chief of the Bureau of Yards and Docks, who shall designate an officer of the Civil Engineer Corps, United States Navy, or other officer or representative of the Government as officer in charge of construction, hereinafter referred to as the "OICC", who . . shall be the authorized representative of the contracting officer and under the direction of the contracting

officer shall have complete charge of the work and shall exercise full supervision and general direction of the work so far as it affects the interest of the Government."

"The provisions in this clause or elsewhere in this contract regarding supervision, approval or direction by the Contracting Officer or the OICC or action taken pursuant thereto are not intended to and shall not relieve the Contractor of responsibility for the accomplishment of the work either as regards sufficiency or the time of performance, except as expressly otherwise provided herein."

Article 39, entitled Government Inspector, provides:

"The work will be conducted under the general direction of the Contracting Officer and is subject to inspection by his appointed inspectors to insure strict compliance with the terms of the contract. No inspector is authorized to change any provision of the specifications without written authorization of the Contracting Officer, nor shall the presence or absence of an inspector relieve the Contractor from any requirements of the contract."

The general contract also required Marden to maintain inspection personnel on the premises in Article 39 thereof which provides:

"The Contractor shall (i) maintain an adequate inspection system and perform such inspection as will assure that the work performed under the contract conforms to contract requirements, and (ii) maintain and make available to the Government adequate records of such inspections."

Notice also should be taken of Article 65 and Article 66 which respectively provide:

"No oral statement of any persons whomsoever shall in any manner or degree modify or otherwise affect the terms of this contract."

"The failure of the Government in any one or more instances to insist upon strict performance of any of the

terms of this contract or to exercise any option herein conferred, shall not be construed as a waiver or relinquishment to any extent of the right to assert or rely upon any such terms or option on any future occasion."

The specifications for the project have the following provisions relative to the construction and erection of the precast concrete arches:

3B.3.3 *Construction of precast concrete*

"At the option of the Contractor, the precast arches may be . . . constructed on the site and lifted into place. . . ."

3B.3.4 *Erection of precast concrete*

"The sequence of erection proposed to be used shall be approved prior to erection. *The work shall be supported, braced, guyed and maintained in position properly until all necessary connections for the holding of the work structurally* are completed. Before the shoring, bracing and guying of arches is removed, a sufficient number of precast roof plank shall be applied for the full length of the building and the connection cast in place to provide longitudinal stability and stiffness." (Emphasis Added)

I find that it was the intent of the Government and of Marden that the precast concrete arches were to be placed on poured concrete buttresses. Twenty-four of these buttresses were to be installed on either side of the hanger prior to the erection of any of the arches. The buttresses were a combination of a column and a footing on which were to be placed concrete arches which would support the roof some forty or more feet above the ground as part of the main framing of the building. The arches were to be connected to these footings and buttresses through the use of dowel steel rods which protruded up out of the footings when they were poured. These rods were then embedded in the buttresses which were poured on top of the footing.

Bolts protruded from the top of the buttresses, some eight in number per buttress. These bolts were intended to receive the hinge plate which in turn was to be slipped over the bolts and then tightened down by the use of large nuts during the course of the installation of the arches on the buttresses.

The plan was to have each completed arch consist of two half arches. The half arches were to be separately installed by being lifted through the use of cranes onto the buttresses where they were to be bolted down while still supported by the cranes, then they were to be joined and bolted together at the mid-point of the complete arch with another hinge assembly while still held by cranes in the vertical position.

Boston Erection made arrangements with Crane to rent to it a Manitowoc Model 2900 truck crane with a 65 ton capacity equipped with a 90 foot boom. The contract also called for Crane to provide the crew to operate the crane.

Erection of the precast concrete arches began on August 7, 1967. Cranes operated by employees of Crane were brought to the job site preparatory to lifting the arches into a vertical position. On August 12, Angelo Nocella, Marden's superintendent, detected a slight movement in the buttress which partially supported Arch A. On Monday, August 14, Arch A was erected on the buttress and Nocella observed some evidence of additional movement of the buttress in the ground. Nocella advised his supervisors, as well as Lieutenant Jump, that he had observed some movement of the buttress by the use of a transit although he did not measure the amount of movement. Nocella also informed Lieutenant Jump that his company had so notified its consultant, Mr. Goldberg. The same day, Goldberg and Dr. Traum, Goldberg's structural designer, came to the job site where Goldberg was informed of the movement of the buttress by Nocella and was requested to help in dealing with the movement. Goldberg informed Nocella that some

movement of the buttress was a natural result from ordinary stress and strain, was to be expected, and that in fact the structure was designed for movement.

Goldberg made inquiry of Nocella as to how rapidly tie rods could be installed between the arches to provide lateral support and was told by Nocella that the rate of tie rod installation would be one tie rod per week at first, with the possibility of the pace of installation eventually being increased to three tie rods per week. Nocella also advised Dr. Traum that the first horizontal tie rod would be installed the following day. In point of fact no tie rods were ever installed.

Shortly after work began on the morning of August 18, the arches which had been erected (all of Arches A, B and C and half of Arch D) collapsed, striking the cranes, causing the deaths of Mr. Sabatino Rosetta and Mr. William McGowan, employees of Crane, and causing a substantial amount of property damage.

The foregoing is a general background description of the contracts which were entered into and the conduct which occurred leading up to the instant litigation. Turning to the specific issues to be resolved herein, namely, did the plaintiff-subcontractors prove by a preponderance of the evidence that labor or material was furnished by them to or in behalf of Marden in prosecution of the work called for by the prime contract and, the subsidiary question, have the subcontractors been paid therefor?

■ I find with regard to the claim of Boston Erection that after entering into its subcontract with Marden on July 28, 1967 (Plaintiffs' Ex. 2), Boston Erection caused its employees to begin work on the job site on August 7, 1967; that its employees proceeded to perform the subcontract on that date and continued to do so until the collapse of the arches on August 18; that Boston Erection's employees during that time period were engaged in the erection of the concrete precast arches pursuant to the sub-

contract; that Boston Erection rented heavy equipment from Crane for the purpose of executing the work required of Boston Erection under its subcontract; and that the four rented cranes brought on to the site were necessary to and used for the work of erecting the half arches into place on the buttresses.

I also find that labor was performed by men and equipment brought to the site by Boston Erection on August 7, 8, 9, 10, 11, 12, 14, 15, 16, 17 and 18, 1967. I find that Boston Erection caused the erection of the arches to take place by attaching lifting devices to those arches; that the first half of the first arch was lifted from the hangar floor by two truck cranes which held the arch at each end thereof; that the weight of the arch, which was approximately 55 tons, was then lifted up into a vertical position by the use of the 110 ton crane which had a lifting capacity of 65 tons; that after being placed in a vertical position the half arch was lifted by the crane so that its bottom reached the elevation of the top of the buttress; that the bottom end of the half arch was then secured to the top of the buttress by employees of Boston Erection and the half arch was then held in place by one of the truck cranes which continued to hold the half arch while the 110 ton crane, assisted by other truck cranes, elevated the other half arch into position atop the other buttress of that arch in a similar manner.

I find that the two half arches were then connected together while their upper ends were held in position by truck cranes. I find no contractual obligation on the part of Boston Erection to immediately apply tie rods, concrete roof planks, or vertical shoring. I further find that had the plans and specifications required the immediate installation of steel tie rods across the inside of the hangar from the point where each half arch joined a buttress to a point on the opposite side of the hangar where the other arch joined a buttress, the proba-

bility is that the outward thrust caused by the weight of the arches would have been substantially reduced, to the point where the footings would not have moved in the ground. This finding is in part premised on the fact that after the tragedy the Navy required this procedure to be followed and that on the basis of the change in procedure the construction of the hangar was ultimately completed.

In short, I find that Boston Erection properly performed its obligation under its subcontract with Marden and that there was no breach of contract by Boston Erection. I find that the value of the labor and materials furnished by Boston Erection to Marden, pursuant to the subcontract, between the dates of August 7 and 18, 1967, was in the amount of $29,583.59 (Plaintiffs' Ex. 7), which amount, plus interest and costs, I find is due from Marden and its sureties on the Miller Act claim of Boston Erection.

■ I find with regard to the claim of Southern, that on July 25, 1967, it entered into a subcontract with Marden (Plaintiffs' Ex. 3), under the terms of which Southern was to furnish all materials and perform all work for structural steel and open web steel joist erection at the Naval Air Station. Employees of Southern began work at the hangar site on August 3, 1967 and pursuant to its subcontract they worked on August 3, 4, 5, 6, 7, 8, 9, 10, 11, 14, 15, 16, 17 and 18, on which dates I find that Southern furnished labor and equipment used in furtherance of Marden's general contract for construction of the aircraft hangar.

I find that pursuant to the subcontract and directions given by responsible employees of Marden, Southern through its employees was engaged in assembling the tie bars on the ground, that Southern had not installed any of said tie bars as of August 18 by reason of instructions which I find were given by Marden to Southern to install the first tie

bar only after the erection of the sixth arch had been completed. I find that the value of the labor and material supplied by Southern between the dates of August 3 and 18, 1967 was in the amount of $6,638.67. This figure does not include any portion of a crane rental charge advanced by Southern, $2,114.48, because recovery of this amount is provided for in the finding earlier in this opinion in Civil Action 68–752. I find that none of the $6,638.67 has been paid by Marden or its sureties to Southern who, I rule, is entitled to recover the $6,638.67, plus interest and costs, as against Marden and its sureties on the Miller Act claim.

■ With regard to the claim of Salah-Pecci, I find that in 1967 they agreed to rent an American Crawler crane to Boston Erection at the rate of $5,500 a month bare; that the crane was brought to the hangar site on August 8, 1967; that between August 8 and 18 the crane was used in the discharge of Marden's obligations under its general contract with the Navy; and that the crane and its boom were damaged on August 18 by the collapse of the arches. I find that thhe fair and reasonable rental value of the crane for the 10-day period when it was used to assist in the discharge of Marden's obligations under the general contract was in the amount of $1,888.83, for which sum I find Salah-Pecci has not been compensated by Marden or its sureties and who, I rule, are liable to Salah-Pecci in such amount plus interest and costs.

■ With regard to the common law counts in tort for negligence against Marden, I find that the employees of Marden acted reasonably in relying on the advice of the various engineering consultants employed on this project, that there was no breach of any duty owed by Marden to either of the three plaintiffs, and that the negligence, if any, which caused this unfortunate accident, was not negligence on the part of

any person for whose conduct Marden is legally responsible.*

Accordingly, judgment will enter for the defendant Marden on the negligence count in each of the three cases.

* This finding is so worded because of the pendency of Civil Action 68–867–C, Marden v. The Phoenix Insurance Company v. Desmond & Lord, Albert Goldberg & Associates and Eliahu H. Traum, decision of which case will require the identification of the negligent party.